# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSE GONZALEZ, | Civil Action Number: |
| **Petitioner,** | **2:09-cv-03426** |
| **v.** | **OPINION** |
| JANET NAPOLITANO, SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, *et al.*, | HON. WILLIAM J. MARTINI |
| **Respondents.** | |

## MEMORANDUM OPINION

### I.   INTRODUCTION

Petitioner has filed a Petition for Review of [the Administrative] Denial of [His] Application for Naturalization. Since then, both parties have filed competing motions for summary judgment.

For the reasons elaborated below and because there appears to be no question of material fact, the Court will **DENY** Petitioner's Motion for Summary Judgment; will **GRANT** Respondent's Motion for Summary Judgment; and, will **DENY** Petitioner's Petition.

### II.   FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Jose Gonzalez (a/k/a Tito) was born in Panama on August 1, 1966 and is a citizen of Spain. When he was about 32 he moved to the United States and began work in the construction industry. At the time of his deposition in 2010, he was working as a longshoreman. Soon after arriving in the United States, Petitioner began relationships with two women.

*Ines Beatriz Otero*. During 1999, Petitioner met and began dating Ines Beatriz Otero, an American citizen, and after roughly 9 months of dating, they married on February 4, 2000.

At the time he married Otero, Petitioner lived in an apartment at 603 North Broad Street, Elizabeth, New Jersey. After marrying Otero, Petitioner moved into her apartment, where Otero's two daughters also lived. Thereafter, Petitioner and Otero's relationship went into decline. He separated from Otero in August 2004, filed for divorce on October 21, 2004, which became final on March 7, 2005. His divorce complaint states that on or about August 1, 2004, he left the marital residence and again took up residence at 603 North Broad Street. The divorce complaint also noted that Petitioner has two children and named YGP and AGP.[1]

*Margarete Picinin*. Margarete Picinin is the mother of YGP and AGP. Picinin is a married Brazilian citizen, who entered the United States around 1995 on a now expired ten-year visa. Picinin married her Brazilian husband while she still lived in Brazil, came to the United States without him, and has had no contact with her husband since that time. During 1998 or 1999, Petitioner began dating Picinin. After some six months to a year of dating, Petitioner began a long term on-again off-again intimate relationship with Picinin. Some time in 2000 or 2001, Picinin moved to 603 North Broad Street. Picinin paid the rent, although Petitioner helped Picinin out with her bills. Petitioner gave Picinin around $300 a month, although he gave her more when, late in her pregnancy, she was unable to work. Petitioner also helped Picinin with her bills during her second pregnancy. Petitioner believed that Picinin also had another male friend who helped her with her bills. In 2003, while still married to Otero, Petitioner moved into Picinin's apartment for several weeks, at a time when Petitioner and Picinin were already having relations. Afterwards Petitioner returned to his marital residence and continued living with Otero. The depositions of Petitioner, Otero, and Picinin do not reflect a second such incident over the course of the marriage prior to Otero and Petitioner's separation in 2004.

When Petitioner met Otero, he had already begun his relationship with Picinin. After marrying Otero, he continued both relationships and it is less than clear what Picinin knew about Otero and when she knew it. At her deposition, Otero denied knowing anything about Picinin.

Picinin gave birth to two children, YGP (a girl), during February 2000,[2] and AGP (a boy), during August 2001. Picinin Depo. 27:22-24, Oct. 13, 2010. Initially, no father was listed on the two birth certificates. According to Gonzalez, when YGP and AGP were born, Picinin

---

[1] The full names of the children appear in the divorce complaint (which is filed under seal). This opinion uses an acronym, as used by the parties throughout briefing on this matter.

[2] Picinin gave birth to YGP after February 4, 2000, that is, after Petitioner and Otero had married.

told him that he was the father. Petitioner claims he did not believe Picinin's claim as to his paternity.[3] In his deposition, Gonzalez neither admits nor denies that these children are his biological children, but he does allow them to use his last name, apparently because he thinks they "may" be his children.[4]

On March 27, 2000, Petitioner filed an Adjustment of Status I-485 Form. Otero supported the application. Indeed, on the same day, Otero filed an Alien Relative Petition I-130 Form on behalf of Petitioner. The application requires the applicant to list all children. Petitioner did not list YGP, who was born earlier that year. *See* Ex. 6 at 7, part 3(b). Although, Petitioner's statement appears to be false, it was not oral testimony. (The Government's brief states that there was an oral interview in which Petitioner affirmed under oath that he had no children, but the Government puts forward no evidentiary support for its position.) On May 19, 2001, Petitioner was granted lawful permanent resident status based on his application.

Petitioner and Otero's tax transcripts for their joint returns reflect that during the years 2001, 2002, and 2003, Petitioner claimed 5 or 6 deductions (with four deductions being accounted for by Petitioner, Otero, and Otero's two children from her prior marriage). The Government believes that these deductions in excess of four reflect that Petitioner knew and acted upon

---

[3] Gonzalez Depo. 63:16 to 64:5, Oct. 13, 2010 ("Q. Did you think [Picinin's baby] was yours? A. Maybe. Q. It could have been? A. Yeah. Q. It didn't matter to you whether it was or it wasn't? A. I don't want to know. Q. Did you ask her? A. Who? Q. Did you ask her whose baby it was? A. Well, yeah, I tried, but, you know, she say he's mine – Q. Okay. A. -- but, you know, like I say, I don't have proof of that. I don't want to know."); *id.* at 77-16 to 77-20 ("So with your second child, your son, did Margarete also tell you that you were the father of him? A. Yes. Q. And did you believe her? A. Well, no."). Picinin claims she never told Petitioner the children were his. Picinin Depo. 19:18-21, Oct. 13, 2010 ("Q. So you never told Tito that your -- that any of your children are -- that he's the father of any of your children? A. No."); *id.* at 26:3-10 (same).

[4] Gonzalez Depo. 42:16 to 43:4 ("Q. And why did you give your name to the [children YGP and AGP]? A. Because I think they *may* be my kids and I try to help them. Q. Okay. So you're not sure that they're your kids? A. No. Q. But why aren't you sure that they're your kids? A. No, no. I'm not sure. I don't say I'm sure. Maybe they can be my kids. I don't know sure -- I don't know for sure if they're my kids or not. Q. But you –A. Well, let's put it this way. I got relations with that woman, but she got, you know, relation with another man, so I know sure if they're my kids or not. I never did the DNA to the kids. I never did it." (emphasis added)); Picinin Depo. 36:23-25 ("Q. So why did you agree [to permitting Gonzalez's name on the birth certificates]? A. Because there is a possibility that he's the father.").

the knowledge that YGP and AGP were his children, even at this early juncture. In his deposition, Petitioner was unable to account for why these Government-created records reflected this number of deductions. The Government also points to the fact that it made a timely discovery request to Petitioner for his actual tax returns, but Petitioner did not produce the returns.

On February 14, 2003, Petitioner filed a Petition to Remove Conditions on Residence I-751 Form. The application requires the applicant to list all children. Here, too, Petitioner did not list YGP and AGP. On or about, July 26, 2004, Gonzalez and Otero's joint checking and joint money market accounts were closed.

On or about July 2004, Petitioner and Otero's relationship went into decline. On or about August 1, 2004, Gonzalez separated from his wife and moved out of the marital residence (which he shared with Otero), moved (back to) 603 North Broad Street, and took up residence with Picinin, YGP, and AGP, who were already living there.

On or about August 3, 2004, Petitioner was interviewed by an immigration officer in regard to his I-751 application. Otero attended the interview and supported the application even though it took place apparently after she and Petitioner had separated on August 1, 2004 (as indicated in Petitioner's divorce complaint). Otero takes the position that she continued to support the application because she had previously started this process on Gonzalez's behalf. Petitioner did not notify the immigration officer of his change in residence or that he had separated from Otero. The application did not reflect that YGP and AGP were Petitioner's children. The application also affirmed that he and Otero continued to have a joint bank account. Makeesha Clark, an immigration officer, has affirmed in a declaration that she interviewed Petitioner, and that Petitioner swore to the correctness of his application on a question-by-question basis. *E.g.*, he had no children. Clark Decl. ¶¶ 5-7, Dec. 21, 2010. The I-751 Form signed by Petitioner has marks on it by each question. This tends to substantiate that Clark had, in fact, reviewed the application with Petitioner as stated in her declaration. The application was approved the day of the interview. The Government argues that approval of his I-751 application was an immigration benefit.

On October 21, 2004, Gonzalez filed for divorce. The divorce complaint stated that Petitioner has two children, and it named YGP and AGP. The divorce complaint stated that Gonzalez left the marital residence on or about August 1, 2004.[5] On March 7, 2005, Gonzalez's divorce

---

[5] Petitioner's divorce complaint states that he moved out of the marital residence on or about August 1, 2004. At his deposition, Petitioner stated that although he moved out, he intended or expected to return to Otero (just as he had returned in 2003 after separating from

4

became final. On March 31, 2005, YGP and AGP's birth certificates were amended by Petitioner and Picinin to reflect that Gonzalez was the father. Gonzalez Depo. 99:24-25, Oct. 13, 2010 ("It's after we get divorced is when I give my name to the kids. I go to the City Hall and change the birth certificates."); *id.* at 100:11-18. By around this time, YGP and AGP call Petitioner "dad." In 2005, Gonzalez purchased a house in Union, New Jersey. He moved into the house with Picinin, YGP , and AGP, where they continue to live. After Petitioner's divorce became final, Picinin gave up working outside the home. Before coming to the United States, Picinin married a man in Brazil. Recently, she has begun proceedings to divorce her husband and plans to marry Petitioner.

On December 19, 2006. Petitioner filed for naturalization (an N-400 application). Some time in June 2007, an immigration officer interviewed Petitioner in regard to his N-400 application. The interviewing officer wrote that Petitioner told him that Petitioner separated from Otero in 2001, not 2004. At this time, Petitioner also told the immigration authorities that he had children. The I-751 application also failed to list some of Petitioner's prior addresses. This information raised red flags with the immigration authorities because this information diverged from the information in Petitioner's prior filings. At his deposition, Petitioner readily agreed that the information he had supplied on the application and in the interview was incorrect, but that he had not personally filled out the I-751 application. The application has a space for a preparer to list his name, but no such name appears. As for the addresses, Petitioner stated in his deposition that it is difficult to remember all the places he has lived "because I lived in too many places, you know, in a short period of time." The interviewing officer apparently reviewed each question with Petitioner and gave him an opportunity to make corrections. Petitioner signed the form under oath in front of the interviewing officer.

The United States Citizenship and Immigration Services ("USCIS") denied Petitioner's N-400 application on the grounds that he (allegedly) made false statements in regard to his marriage to Otero, his addresses, and his children. He subsequently appealed this decision and, on June 12, 2009, when USCIS denied his administrative appeal (N-336 Form) on the merits, he, thereby, exhausted available administrative remedies. On June 24, 2009, USCIS served a notice to appear ("NTA") on Petitioner. The NTA charges that Petitioner is removable pursuant to 8 U.S.C. § 1227(a)(1)(B). Furthermore, on June 12, 2009, the NTA was referred to the Immigration Court in Newark, New Jersey. On July 10, 2009, and pursuant to 28 U.S.C. § 1421, Petitioner timely sought *de novo* judicial review of the USCIS's June 12, 2009 denial of his application for naturalization. In prior proceedings, this Court determined that, notwithstanding concurrent related proceedings before the

---

his wife for a few weeks). Gonzalez Depo. 110:16-17.

immigration court, this Court had subject matter jurisdiction to hear an appeal in regard to the USCIS's administrative denial of his application for naturalization. The parties have cross-filed for summary judgment.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery [including, for example, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (explaining that a court may not make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir.2007).

Judicial review of an application for naturalization is *de novo*. 8 U.S.C. § 1421. The applicant bears the burden of proof. 8 U.S.C. § 1427(e); *Berenyi v. District Director, INS*, 385 U.S. 630, 636-37 (1967). Among the requirements for naturalization, the applicant must establish his "good moral character." 8 U.S.C. § 1427(a). More specifically, Congress has determined that "false testimony for the purpose of obtaining any benefit" in an immigration proceeding is a statutory bar to establishing "good moral character." *See* 8 U.S.C. § 1101(f)(6).

## IV.   ANALYSIS

The gravamen of the Government's position is that YGP and AGP are Petitioner's children, yet they are not reflected on his and Otero's I-130, I-485, and I-751 forms. Nor was this relationship disclosed to the Government during the I-751 interview conducted by the immigration officer. The Government's position is Petitioner gave false answers under oath on the forms and orally in order to receive an immigration benefit by heading off questions and investigations the immigration authorities otherwise might have asked and conducted. Those investigations *may* have concluded that Petitioner's marriage to Otero was a sham, and also put in jeopardy Picinin (whose ten-year visa was to expire some time in 2004 or 2005). Petitioner's willingness to protect Picinin in this manner, and to put his own naturalization proceedings at risk, might lead one to suspect that his marriage to Otero was a sham. The

Government's approvals of his various applications were the immigration benefits Petitioner received, and he received those benefits because his answers cut off otherwise lawful inquiries surrounding his relationships with Otero and Picinin, and with YGP and AGP. *Berenyi*, 385 U.S. 638 ("The Government is entitled to know of any facts that may bear on an applicant's statutory eligibility for citizenship, so that it may pursue leads and make further investigation if doubts are raised."). Making all reasonable inferences in favor of the Petitioner, the Court concludes that the Government has carried its burden.

First, the fact that YGP and AGP are Petitioner's children is reflected on the childrens' birth certificates, and Petitioner sought the amendments to the birth certificates listing him as father. The Court may take judicial notice of such public government records, particularly, where, as here, Petitioner sought to list his name on the record just as it now appears. Fed. R. Evid. 201(b)(2); *Terry v. Cross*, 2001 WL 34664943, at *2 (E.D. Va. June 20, 2001) (finding no error in taking judicial notice of birth certificate).

Second, Petitioner's continuous unbroken long-term course of conduct is revelatory that he is the father. He was having relations with the mother at around the time each child was conceived. His relationship with the mother continued over time and continues to this day. He helped support the mother over the course of her pregnancy, and increased his support when, in the late stages of pregnancy, she was unable to work. When the children were born, the mother told him that he was the father. There is some evidence supporting the inference that he took tax deductions for these children in the years immediately following their births.[6] He allowed the children to call him "dad." And, as explained, Petitioner amended (with the mother) the birth certificates. Petitioner's behavior is the behavior of a father, and one who knows and has always known that he is the father.

Here the Government's forms direct the Petitioner to list his children. He did not list YGP and AGP. He did not disclose to the Government that they are his children or even that they *may* be his children. His failure to fully disclose this information before the immigration

---

[6] Gonzalez Depo. 130:11-22 ("Q. Could it be that you listed -- could it be that the children you had with Margarete are listed on your tax returns for any of the[] years [2001 to 2003]? A. I think I start putting them in 2004, in the taxes for 2004, 2005. I don't know. Q. But you're not sure? A. No. Q. They could be on the ones for 2001, 2002, 2003? A. I don't think so. Q. But then -- well, what other explanation would there be? A. I don't know."). Gonzalez stated in his deposition that his tax documents were prepared by a preparer, not by him.

officer at the interview for his I-751 application amounts to false oral testimony.[7] This failure to disclose along with his failure to list his children on his written applications undermine his claim to good moral character.

Petitioner's responses are not convincing . Petitioner argues in his brief that he did not disclose the birth of his two children in the documents he submitted to the immigration authorities (the I-485 Form, and the I-751 Form) and at the interviews held in conjunction with those filings because "he [that is, the Petitioner] never *acknowledged* that they were in fact his children." Doc. No. 53 at 8; Doc. No. 38 at 21 (arguing that he did not "*know*, []or *acknowledge*, that he had fathered" AGP and YGP); *id.* at 24 (same). What Petitioner "acknowledged" was not relevant to the Government's inquiries. The immigration authority's forms did not ask and the immigration officers did not ask Petitioner *"What children have you held yourself out to be the father?*," but rather he was directed to "[*l*]*ist your present husband/wife, [and] all of your sons and daughters.*" Ex. 52-2 at 7 (I-485 Form); *see also* Ex. 52-4 at 3 (I-751 Form) (directing the applicant to "*List all your children.*"). Both these forms were signed by the Petitioner under the penalty of perjury.

The remainder of Petitioner's responses are conclusory or based on wholly self-serving evidence absent factual support. Petitioner argues that he did not "know" he was the father at the time he filled out these forms and at the time of the I-751 interview. Indeed, even at his deposition, he claimed not to be sure that he is YGP and AGP's father. Unmarried men who father children or may have fathered children are not exempt from truthfully answering the Government's questions. It is not the Government's job to conduct blood tests on a would-be applicant's behalf; rather, it is the applicant's duty to take care that his immigration application discloses truthful answers.

Petitioner was asked at his deposition why he was not sure that he was the father of YGP and AGP. He answered that he did not have the benefit of a blood test establishing his paternity. But the *only* reason no blood test was performed was because Petitioner did not want to know

---

[7] "False testimony" for the purposes of 8 U.S.C. § 1101(f)(6) requires false "oral testimony." *Kungys v. United States*, 485 U.S. 759, 780 (1988). The oral testimony requirement appears to be met here where the Government's position is supported by the declaration of the immigration officer who conducted the I-751 interview. *See* Clark Decl. ¶ 5, Dec. 21, 2010 (affirming that Gonzalez "was placed under oath and then asked a series of questions relating to his petition. Specifically he was asked to orally affirm his written answers to each question. As he did this, I checked each question, as was my usual practice"). The I-751 Form has checkmarks, establishing that Gonzalez failed to declare either AGP or YGP as his children, although he was asked.

if he was YGP and AGP's biological father.

> [The Government. Q.]. And it doesn't matter to you whether they're --
> [Petitioner. A.]. No.
> Q. -- your kids or not?
> A. No.
> Q. Like if you had a blood test and --
> *A. Yeah. I don't want to know*.
> Q. You don't want to know?
> A. No.

Gonzalez Depo. 70:19-25 to 71:1 (emphasis added). Gonzalez wants the Court to believe that he did not lie on his immigration forms because he had conducted no investigation to determine the children's paternity. The simplest explanation for Gonzalez's lack of curiosity in regard to a blood test is that he was never in doubt as to who YGP and AGP's father was. This is strongly confirmed by his conduct at every step of the way – beginning with his relationship with Picinin and her two pregnancies, moving back to 603 North Broad Street, his divorce, and supporting these children all along the way. He acted like a father. Finally, his efforts to amend the birth certificates (and his listing YGP and AGP as his children on his divorce papers) undermine his claim that he is not sure as to who their father is.[8] Petitioner's claim that he agreed to amend the birth certificates for reasons other than believing he was their father are entirely self-serving. *Celotex*, 477 U.S. at 332 ( "[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment. Instead, the affiant must set forth specific facts that reveal a genuine issue of material fact.").

Finally, the chronology of Petitioner's story does not withstand scrutiny. When Petitioner was asked why he chose to have the childrens' birth certificates amended to list him as the father. He responded:

> [Petitioner. A.] It's after we get divorced is when I give my name to the kids. I go to the City Hall and change the birth certificates. You know, I don't change. I put, you know, my name to the kids, but after we get divorced, not

_____

[8] Adopting Petitioner's position would have serious and far reaching policy implications. It would amount to allowing every unmarried biological father to claim that he is not a father because he cannot be "sure" that he is a father absent a blood test. If this were the rule for immigration proceedings, applicants would have every reason to avoid blood tests.

9

before. Before -- until I get divorced the kids are just like they don't have a
father. They got a single mother. That's all.
Q. And then after the divorce?
A. Excuse me?
Q. And then after the divorce?
A. Yeah, is when I go to the City Hall and change the birth certificate and put
my name on the kids. I give them my name.
Q. You felt like -- well, why did you do that?
A. Well, because, like I say, after I get divorced we still live together, so we
start like a new life, you know. I get, you know -- what do they call it? I'm in
love with the kids, too, you know, and that's it. And by the way for -- if I give
them my name I can put them on my insurance, you know. They get insurance.
Private insurance I mean.

Gonzalez Depo. 99:23-25 to 100:1-18. Petitioner moved out of the marital residence in
August 2004 and in March 2005 his divorce became final. Afterwards, he amended the birth
certificates. However, well prior to March 2005, in October 2004, Petitioner filed for
divorce, and in those papers – long before his divorce became final – he named YGP and
AGP as his children. (Doc. No. 43-1 at 4.) There is no indication that he was not sure of
paternity, and there is no indication that he listed them on his divorce complaint to confer a
benefit upon them (insurance or otherwise). In short, between the birth certificates and the
divorce papers (and possibly federal tax documents), Petitioner filed an array of documents
testifying to the fact that these children were *his* children. His deposition statement to the
effect that he did not believe he was their father at the time he filled out the I-751 Form and
at the time of the interview is not supported by any specific facts and is entirely self-serving.
Having considered all the evidence and drawing inferences in the light most favorable to
Gonzalez, the facts overwhelming support the conclusion that he believed he was YGP and
AGP's father during the interview on his I-751 application and actively refrained from
disclosing this information to the immigration officer conducting the interview.

In short, the uncontradicted evidence is that Petitioner, while under the penalty of perjury,
gave false evidence in order to receive a benefit in an immigration proceeding. 8 U.S.C.
§ 1427(a); 8 U.S.C. § 1101(f)(6); *Golding v. Dep't of Homeland Sec.*, 2009 WL 2222779,
at *14 (S.D. Fla. July 27, 2009) ("It is not within Plaintiff's discretion to decide what
information to disclose and what to withhold."). Moreover, it appears that Petitioner not only
gave false evidence, but he gave false oral testimony. *See* Clark Decl. ¶ 5 (explaining that
Petitioner swore under oath to the truthfulness of his written answers). In these
circumstances, Petitioner cannot establish his good moral character. *See, e.g.*, *Azziz v.
Chertoff*, 527 F. Supp. 2d 188, 192 (D. Mass. 2007) ("Azziz failed to list her child, thereby
giving false testimony in order to obtain immigration benefits. That false testimony

demonstrates that, pursuant to the statutory prerequisites, Azziz is not a person of good moral character. Her application for naturalization was, therefore, properly denied and the government's motion for summary judgment will be allowed."). Therefore, the petition for naturalization will be denied.

## V.   CONCLUSION

For the reasons elaborated above, the Court **DENIES** Petitioner's Motion for Summary Judgment; **GRANTS** Respondent's Motion for Summary Judgment; and, **DENIES** Petitioner's Petition.

An appropriate order accompanies this memorandum opinion.

This terminates this action.[9]

                                        s/ William J. Martini
**DATE: March 16, 2011**          **William J. Martini, U.S.D.J.**

---

[9] In *Gonzalez v. Holder*, 2:09-cv-5357 (D.N.J. Jan. 20, 2009), this Court issued an order staying that action, which is related to the instant action, and also ordered Gonzalez to file his opposition brief in that related action within 15 days of this Court's entry of final judgment in the instant action.